**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TYRIN GAYLE, | : | |
|     Plaintiff | : | No. 1:23-cv-00861 |
| | : | |
|     v. | : | (Judge Kane) |
| | : | |
| S. MOWATT, MD, et al., | : | |
|     Defendants | : | |

**MEMORANDUM**

Currently before the Court is Defendants' motion to dismiss pro se Plaintiff's amended complaint or, in the alternative, motion for summary judgment. For the reasons stated below, the Court will grant the motion to dismiss, dismiss Plaintiff's amended complaint for lack of subject-matter jurisdiction and for the failure to state a plausible claim for relief, and not provide Plaintiff with leave to file a second amended complaint. The Court will also deny the motion for summary judgment as moot and direct the Clerk of Court to close this case.

**I.     BACKGROUND**

Pro se Plaintiff Tyrin Gayle ("Gayle"), a convicted and sentenced federal prisoner, commenced this action by filing a complaint, an application for leave to proceed in forma pauperis ("IFP Application"), and certified prisoner trust fund account statement, all of which the Clerk of Court docketed on May 24, 2023. See (Doc. Nos. 1–3). In the complaint, Gayle asserted claims for violations of his First and Eight Amendment rights under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) and state-law claims for negligence under the Federal Tort Claims Act ("FTCA") against Defendants United States of America (the "Government"), S. Mowatt, M.D. ("Dr. Mowatt"), Rhea Carey, PA-C ("Carey"), John Keelen, CRNP ("Keelen"), Ann Narcoonis, APN ("Narcoonis"), and Jeremy Simonson, Health Service Assistant ("Simonson"). See (Doc. No. 1 at 1–3).

On July 11, 2023, the Court issued a Memorandum and Order which, <u>inter alia</u>, granted the IFP Application, dismissed the complaint, and provided Gayle with leave of Court to file an amended complaint within thirty (30) days.  <u>See</u> (Doc. Nos. 6, 7).  After receiving an extension of time (Doc. Nos. 8, 9), Gayle timely filed an amended complaint on September 6, 2023, along with separately docketed exhibits.[1]  (Doc. Nos. 11, 12).  Regarding the named Defendants and the causes of action in the amended complaint, Gayle names the same six (6) Defendants he named in his original complaint; however, he indicates that he is no longer asserting an FTCA claim or <u>Bivens</u> claims for violations of the First Amendment.  (Doc. No. 11 at 1–3).  Instead, he indicates that he asserts only <u>Bivens</u> claims for alleged violations of his rights under the Eighth and Fourteenth Amendments.  (<u>Id.</u> at 1, 10).  For relief, Gayle requests an injunction "for an effective treatment to diagnosis [sic] seizure disorder, that is, long-term, ambulatory, video EEG monitoring and a clinical correlation is requested" with a doctor, as well as monetary damages. <u>See</u> (<u>id.</u> at 10).

Concerning his factual allegations, Gayle describes events that allegedly occurred between late-August 2019 through early-March 2023 while he was incarcerated at United States Penitentiary Canaan ("USP Canaan").[2]  (<u>Id.</u> at 4–10).  Gayle's allegations start with a medical visit he had with Carey at USP Canaan's Health Services on August 28, 2019.  (<u>Id.</u> at 5).  During this visit, Gayle informed Carey that he had experienced seizures following a motor vehicle accident in 2015, and he had two (2) "episodes" earlier that day.  (<u>Id.</u>)  Based on her evaluation, Carey assessed Gayle as having "Epilepsy/Seizure Disorder," and he was prescribed 100 mg

---

[1]  Gayle submitted his medical records as exhibits.  (Doc. No. 12.)  Most of Gayle's allegations in his amended complaint are purported summaries of the contents in those medical records. (Doc. No. 11 at 5–8.)

[2]  Gayle is currently incarcerated at Federal Correctional Institution McKean.

"Phenytoin Sodium ER Capsule" to take three (3) times per day. See (id. at 5; Doc. No. 12 at 2). In addition, lab tests and an on-site CT Scan were ordered. See (Doc. No. 12 at 2).

The following day, Gayle appeared at the pill line looking for medications. See (Doc. Nos. 11 at 5; Doc. No. 12 at 4). A Federal Bureau of Prisons ("BOP") Health Services Clinical Encounter Administrative Note from Tom Horeis, PharmD ("Dr. Horeis"), states that Gayle had not picked up his medication the prior evening, i.e. after Carey had prescribed Phenytoin to him. See (Doc. No. 12 at 4). Dr. Horeis issued Gayle's medication to him; however, Gayle indicated that "he was not interested in taking any medication until he knew for sure" what his diagnosis was. See (id.). Although Dr. Horeis explained to Gayle that he was prescribed Phenytoin as a preventative measure, and that Gayle had a follow-up appointment scheduled, Gayle "continued to advise that he was not interested in taking a medication regularly unless he had a test or something of that sort to define his [diagnosis]." See (id.).[3] Dr. Horeis urged Gayle to "walk over to sick call to verify [his] follow up and to talk a little more about the medications." See (id.). Dr. Horeis noted that when the pill line concluded, Gayle was no longer in the room. See (id.). Dr. Horeis also noted that he would attempt to place Gayle on "call out for tomorrow." See (id.).

On the same date, Gayle had a CT Scan of his brain without contrast performed. (Id. at 5; Doc. No. 11 at 5.) The report from the scan, issued by Phyllis Kapellen, M.D., stated that Gayle's scan was "[u]nremarkable." See (Doc. No. 12 at 5).

---

[3] Gayle's medical records contain numerous abbreviations for terms that are not defined therein. Where possible, the Court has identified the terms for the abbreviations through Taber's Medical Dictionary Online, available at: https://www.tabers.com/tabersonline, and replaced the abbreviations with the terms in the quoted material from the medical records.

Approximately three-and-a-half (3 ½) months later, on December 9, 2019, Gayle met with Dr. Mowatt at Health Services for the Chronic Care Clinic. (Id. at 6; Doc. No. 11 at 4.) Dr. Mowatt's notes from this visit reflect that Gayle told her that since his motor vehicle accident in 2015, he periodically had episodes "where he bites his tongue, does not remember, [and] feels tired and confused." See (Doc. No. 12 at 6). Dr. Mowatt notes that Gayle was scheduled to have an EEG, and since Gayle had "not really been taking the medication regularly," she wanted him to hold off his medications and "get testing while off [AED][4] to see if abnormal or not." See (id.; Doc. No. 11 at 5); see also (Doc. No. 11 at 4 (alleging that Dr. Mowatt discontinued medication and ordered testing "because of [Gayle's] desire not to take medication if[,] as the staff says[,] that [he] does not have seizures")). Dr. Mowatt also indicates Gayle agreed with her plan and was sleeping on the low bunk. (Doc. No. 12 at 6.)

Gayle was evaluated by John Veina, NREMT-P ("Veina"), at Health Services on December 23, 2019, because he "reportedly" had two (2) seizures that day and bit the tip of his tongue. See (id. at 8; Doc. No. 11 at 5). Veina's administrative notes from this encounter indicate that Veina spoke to the "Doctor via phone and she stated to start [Gayle] back on his Phenytoin ER 100 MG Cap. 1 Tablet 3 times daily and to be placed on pill line." See (Doc. No. 12 at 8). Apparently, this was done "without approval from Gayle." See (Doc. No. 11 at 5).

---

[4] AED refers to an "antiepileptic drug." See AED, Taber's Medical Dictionary Online, https://www.tabers.com/tabersonline (last visited February 7, 2025). Later in his complaint, Gayle appears to believe that "AED" refers to an automated external defibrillator. See (Doc. No. 11 at 6 ("Gayle approached Dr. Mowatt while he was in Health Services, questioning why he is no longer on AED [Automated External Defibrillator] . . . ."). It is highly unlikely that Gayle is correct insofar as an automated external defibrillator "is a portable device that can be used to treat a person whose heart has suddenly stopped working." See Mayo Clinic, Automated External Defibrillators: Do You Need an AED? (last visited February 7, 2025).

On January 3, 2020, Gayle had a follow-up visit at Health Services.  (Id.; Doc. No. 12 at 10.)  The administrative notes from this visit indicate that, inter alia, Gayle (1) had not had any seizures since his last episode, (2) recently restarted on Dilantin to treat his seizures, (3) missed his morning dose of Dilantin, (4) was unhappy about having to take medication for his seizures, and (5) had an EEG that was "pending to be scheduled."  See (id. at 10–11; Doc. No. 11 at 5).  The notes also state that Gayle "[n]eed[ed r]einforcement" regarding taking his medications.  See (Doc. No. 12 at 11).

Gayle underwent an EEG on January 27, 2020.  (Id. at 12; Doc. No. 11 at 5).  Vithalbhai D. Dhaduk, M.D. ("Dr. Dhaduk") issued a report from the EEG, which provides the following impression: "THIS IS A NORMAL EEG RECORDING WITH NO EVIDENCE OF EPILEPTIGENIC ACTIVITY SEEN.  SIMULTANEOUSLY EKG RECORDING REVEALS NO CARDIAC ARRHYTHMIAS."  See (Doc. No. 12 at 12).  Dr. Dhaduk's report also indicates that "IF CLINICALLY SUSPECTED TRUE SEIZURE DISORDER, ONE MAY CONSIDER LONG-TERM, AMBULATORY, VIDEO EEG MONITORING.  CLINICAL CORRELATION IS REQUESTED."  See (id.; Doc. No. 11 at 5).  Gayle alleges that Dr. Dhaduk told him during this appointment that he "should not take any kind of medications until [he] was truely [sic] diagnosed to have seizures."  See (Doc. No. 11 at 8).

A follow-up visit at Health Services occurred on February 7, 2020.  (Id. at 6; Doc. No. 12 at 13.)  The administrative notes from this visit indicate that Gayle reported that he had not recently taken the Dilantin as prescribed "because [the] neurologist told him he did not need to take [it]."  See (Doc. Nos. 11 at 6; 12 at 13).  The notes also show that Health Services did not have any documentation yet relating to Gayle's visit with neurology and the EEG on January 27, 2020.  See (Doc. No. 12 at 13).

Health Services reviewed Dr. Dhaduk's report from Gayle's January 27, 2020 EEG on February 10, 2020.  (Id. at 16; Doc. No. 11 at 6.)  The administrative notes from this review reflect that Health Services was aware that the EEG "was normal with no evidence of epileptogenic activity seen" and Gayle "was non[-]compliant with Dilantin during that time and Dilantin level subtherapeutic."  See (Doc. Nos. 11 at 6; 12 at 16).  The notes also indicate that the plan was to follow up with Gayle in clinic to discuss the EEG results and discontinuing his prescription for Dilantin.  (Doc. Nos. 11 at 6; 12 at 16.)

A month later, on March 10, 2020, Gayle had a follow-up visit at Health Services in which they discussed his EEG results, which "did not indicate epileptic focus" and were within normal limits.  (Doc. Nos. 11 at 6; 12 at 17.)  The administrative notes from this visit indicate that, according to a discussion with Gayle, "he does not have grand mal type seizures, but [a series of] focal seizures (staring amnesia)."  See (Doc. No. 12 at 17).  The notes also show that Gayle had been non[-]complaint with regularly taking Dilantin.  (Id.)  The notes further state that Gayle's case was discussed with the doctor, and due to Gayle's normal EEG and Dilantin level subtherapeutic, they were discontinuing Gayle's prescription for Dilantin and his low bunk pass. (Id.)  Gayle was to follow up as needed, and the notes show that Gayle was "agreeable with [this] plan."  See (id.).

The next day, Dr. Mowatt prepared an administrative note stating that Gayle had approached her while they were both in Health Services that morning.  (Doc. Nos. 11 at 6; 12 at 20.)  Her note indicates as follows:

> [A]pproached by [Gayle] while he was in health services this am[.  H]e is questioning why he is no longer on AED[.  I] explained his EEG was normal[,] he was non[-]compliant with his medications and now noted no need for AED.  He states he is still having episodes, he was never on medication prior[,] and now he wa[n]ts to take chronically.  We will continue to follow.  He then asked who is

above me in the department, I explained I am the only physician, he was welcome to speak with HSA if he wanted.  He then left the department.

<u>See</u> (Doc. No. 12 at 20).  Gayle avers that the "HSA" or "Health Services Assistant," was

Simonson.  (Doc. No. 11 at 6).

Dr. Mowatt also prepared an administrative note dated March 24, 2020, pertaining to a

Chart Review she performed relating to Gayle.  (<u>Id.</u>; Doc. No. 12 at 21.)  This note states:

[Gayle] was never diagnosed with seizure disorder prior to being here as [USP Canaan.  H]e reported staring spells being out of it that followed a [motor vehicle accident] from years ago[.  H]e was empirically started on medication but was non[-]compliant.  He was sent out for EEG that did not show epileptiform waves.  Since then he [complains of] frequent seizures and now biting his tongue??  No criteria to place on medication at this time.  Normal CT head and EEG within the last year.

<u>See</u> (Doc. No. 12 at 21).

Gayle was next evaluated at Health Services on April 26, 2020.  (<u>Id.</u> at 22; Doc. No. 11 at

6.)  The administrative note for this visit indicates as follows:

C-1 unit officer contacted medical regarding . . . Gayle . . ., who stated that he "had a seizure."  [Gayle] never hit the duress alarm, but told the officers on rounds that he has been having seizures "all weekend long" and "remembers having them."  [Gayle] was sent to [Health Services] where he was evaluated.  Upon reviewing previous documentation, [Gayle] was recently spoken to by the acting clinical director regarding a normal EEG and head CT, which is why his AED were discontinued.  When [Gayle] arrived [Health Services] he became argumentative stating "I know I'm having seizures, I remember having them and my cellie tells me."  Health services staff told . . . Gayle during this encounter that he did not have postictal signs as well as about his normal CT/EEG.  At which time he became even more agitated and verbally aggressive towards medical staff.  [Gayle] was advised that he could speak with the HAS should he have any further concerns specific to this topic, and based on his level of agitation and swearing at staff, that he should leave the department at this time.

<u>See</u> (Doc. No. 12 at 22).

Gayle appeared at Health Services for a clinical encounter on June 18, 2020, after his unit

officer reported that he "was acting '[s]paced out.'"  <u>See</u> (<u>id.</u> at 24; Doc. No. 11 at 6).  The

administrative notes for this visit reflect that Gayle walked to Health services "unassisted."  <u>See</u>

(Doc. No. 12 at 24).  While there, Gayle indicated that "he thinks he had a seizure because he woke up and he had bit his tongue," "he is having regular seizures though not frequently," and "his seizures '[p]lay with [his] memory.'"  See (id.).  The nurse who examined Gayle pointed out that Gayle was "sluggish to respond at times."  See (id.).  The nurse's assessment states that Gayle's behavior was "[a]ltered," that it was "[u]nclear at this time if [his] seizure claims are substantiated," and that he was stable with "[n]o obvious life-threatening illness or injuries noted."  See (id.).  The nurse also indicates that Gayle had a minor injury to the tip of his tongue. (Id.)

Dr. Mowatt also examined Gayle that day, and she noted that Gayle told her that he was "convinced he was having seizures."  See (id. at 26; Doc. No. 11 at 6).  Dr. Mowatt pointed out that when they told Gayle to take medication, he had refused, and he also had a normal EEG and CT scan.  (Doc. No. 12 at 26).  When Dr. Mowatt asked Gayle what he wanted, Gayle told her that he wanted to know what was happening to him, and he stated he has memory issues and bites his tongue.  (Id.)  Dr. Mowatt placed a request for Neurology to evaluate Gayle, and she indicated that Gayle would get another EEG along with a "sleep deprivation and neuro consult." See (id.).

Veina saw Gayle again on August 8, 2020.  (Id. at 28; Doc. No. 11 at 7.)  Veina's notes from this visit reflect that the unit officer called him to see Gayle because Gayle claimed he had a seizure.  (Doc. No. 12 at 28.)  Those notes also indicate that Gayle was claiming that he was having seizures, even though "it [sic] was unwitnessed."  See (id.).  Gayle also claimed he had "one about an hour ago," even though Veina observed that Gayle "showed no [signs and symptoms] of being postictal."  See (id.).  Veina reviewed Gayle's vitals and found them to be

within normal limits.  See (id.).  Gayle was released back to his housing unit and was advised that he would be scheduled with a provider for a follow-up.  (Id.)

The next event described in the amended complaint did not occur until December 2, 2020, when Dr. Sanjay Sood ("Dr. Sood") evaluated Gayle in his housing unit.  (Id. at 30; Doc. No. 11 at 7.)  Dr. Sood's notes from this visit indicate that Gayle "notes [an] episode of seizure with lip biting; he had previous work up by neurology regarding seizures [which were] determined to be negative."  See (Doc. No. 12 at 30).[5]  Dr. Sood's exam comments state: "inner upper lip with erosion."  See (id.).  His plan was to, inter alia, schedule a consultation for Gayle with Neurology (off-site) to evaluate Gayle for "Petit Mal or Partial Complex Seizures" due to "Gayle report[ing] episodes of 'black outs' followed by lip biting (lip wound noted)."  See (id. at 31).

More than six (6) months later, on May 25, 2021, Veina went to Gayle's cell in response to a call for a medical emergency, after the "Unit Officer reported that [Gayle's] cellmate came to the Officer station and reported that [Gayle] was having a seizure[, and the] Officer reported that when he got . . . to [the] cell he found [Gayle] laying on the cell floor with his head shaking from side to side."  See (id. at 32–33; Doc. No. 11 at 7).  Veina's clinical encounter notes indicate that when he arrived less than two (2) minutes after the call, Gayle was standing outside his cell and reported to Veina that he just had a seizure.  (Doc. No. 12 at 33.)  Veina and Gayle then proceeded to go to "medical," with Veina noting that Gayle "walked from [h]is cell down the stairs and to medical without assistance with a normal gait."  See (id.).  Viena's notes show that Gayle's vitals were examined and appeared to be within normal limits.  (Id.)  Gayle also

---

[5]  Dr. Sood's administrative notes show that he also evaluated Gayle for right knee pain.  (Doc. No. 12 at 30.)  The Court has not referenced any notes relating to that evaluation because there is no indication that the knee pain was related to any seizures.

stated that he did not recall what occurred, but he knew he had a seizure because he bit his lip.
(Id.)  Viena remarks in his notes that Gayle had a mark on his lower lip where it appeared that he
bit his lip.  (Id.)

On June 27, 2021, a triage note was prepared after an encounter with Gayle at Health
Services.  (Id. at 34; Doc. No. 11 at 7.)  The note shows that a unit officer contacted Health
Services after Gayle's cellmate said Gayle had a seizure that was not witnessed by staff.  (Doc.
No. 12 at 34, 35.)  The note also indicates that Gayle "was able to walk immediately to Medical
from [the] housing unit without difficulty or confusion," "was immediately able to answer
questions appropriately," "denie[d] any pain," and "denie[d] any recent seizure activity."  See
(id. at 35).

Gayle had a follow-up visit with Keelen at Health Services on September 13, 2021.  See
(id. at 37; Doc. No. 11 at 7).  Keelen's notes from this visit indicate that it was scheduled due to
Gayle's left-hand splint and scheduled orthopedic appointment.  (Doc. No. 12 at 37.)  The notes
also state that Gayle was noncompliant with the use of the splint and was "more concerned about
[an] EEG that was canceled due to none [sic] compliance with medication and [his] last EEG
[was within normal limits]."  See (id.).  Keelen reports that he "explained to [Gayle that] he has
not dropped a cop out to [him] about seizers [sic] or has not had a medical emergency . . . since
[Keelen has] been here."  See (id.).

Gayle avers that he next visited Health Services for a sick call encounter on January 31,
2022.  (Id. at 39; Doc. No. 11 at 7.)  Keelen prepared notes from this visit indicating that Gayle
had filled out a sick call due to an unwitnessed seizure.  (Doc. No. 12 at 39.)  Keelen also states
that Gayle "had a history of having unwitnessed seizures" and "has not been post-ictal [sic]."
See (id.).  Keelen reports that he explained to Gayle that he did not have a seizure disorder.  See

(id.).  Keelen's exam showed no "abnormal findings."  See (id. at 40).  However, Gayle alleges

that he insisted to Keelen that he had a seizure, which "agitated" Keelen to the point where he

called Gayle a liar and kicked him out of the room while yelling, "You don't have seizures!"

See (Doc. No. 11 at 8).

On May 6, 2022, Narcoonis conducted an injury assessment of Gayle at the Special

Housing Unit ("SHU").  (Id. at 7; Doc. No. 12 at 41.)  Narcoonis's notes from this assessment

indicate that Gayle reported that he "fell to the ground during his seizure and bit his lip" and was

experiencing "headache, [a] bloody lip, muscle weakness, [and] confusion."  See (Doc. No. 12 at

41).  Narcoonis also noted that an unidentified Operations Lieutenant suspected that Gayle had

used an "illicit substance."  See (id.).  As for her assessment, Narcoonis stated as follows:

Suspected Drug Usage

[Gayle] was observed by staff as lethargic and slow to respond in housing unit.
Officer report [sic] "[Gayle] acting strangely in housing unit."  Escorted to medical
for evaluation.  Evaluation completed by Baron Paramedic to assess a possible
seizure.  It was determined that [Gayle] did not have a seizure on the housing unit
and does not have a history of testing which would indicate the diagnosis of a
seizure.

This writer saw [Gayle] in SHU for medical evaluation due to change in mental
status, as requested by Op [sic] Lt.  Gait unsteady at times.  Pupils dilated to 3 mm,
equal[,] however sluggish to light.  [E]yes somewhat watery/glossy.  [A]ffect flat.
[B]ody mechanics + rigid.

[R]eported by Op [sic] Lt. that Visual [sic] hallucinations were present.  [G]rabbing
an object not present.  This provider was not witness to [visual hallucinations].
[S]low to respon[d] to . . . questions.  [N]o evidence of burn marks on fingers.

[Complains of] headache.  [D]enies current [nausea or vomiting].  [D]enies
[shortness of breath].  [Gayle] denies any drug use.

Review of [Gayle's] medical records does not indicate any current medication or
medical condition which would be contributory to [his] current status.  Last EEG
reviewed-normal results.  [N]ot currently prescribed any seizure medication
although [Gayle] reports he is prescribed medication for seizures.  Medical

determination = [Gayle's] behavior/current status is not related to any current medication condition and is most likely congruent with use of an illicit substance.

See (id. at 41–42).

Along with identifying the information in Narcoonis's report, Gayle alleges that she "put [him] in the SHU." See (Doc. No. 11 at 8).[6] Gayle complains that Narcoonis "had no reason" to have him sent to the SHU and falsely accused him of using illicit substances. See (id.). Gayle avers that he does not use drugs. (Id.) Apparently, this incident resulted in Gayle being locked up in disciplinary segregation for thirty (30) days and the imposition of several sanctions. (Id.).

Approximately ten (10) days after his visit with Narcoonis, Gayle had a follow-up visit with Keelen at the SHU relating to his complaint of a seizure. (Id. at 7; Doc. No. 12 at 43.) Keelen's notes from this visit indicate that Gayle "has a [history] of saying he has [seizures] but no medical evidence of [seizures]" and "state[d] that he does not take any [medications]." See (Doc. No. 12 at 43). Keelen also indicates that he examined Gayle and reported no abnormal findings. See (id.). Gayle alleges that Keelen told him that he could not "exclude[] that [Gayle's] seizures were self[-]inflicted verse [sic] external trama [sic]." See (Doc. No. 11 at 8). Gayle believes that Keelen was accusing him of being a liar by faking seizures. (Id.)

On September 13, 2022, Carey prepared an administrative note based on her review of paramedic findings from an exam of Gayle. (Id. at 7; Doc. No. 12 at 45.) Carey's note stated as follows:

> [C]alled in to review paramedic findings from exam. [Vital signs stable]. [B]enign exam except for swelling and abrasion to the inner upper lip. [E]xamined by dental and found to be inconsistent with biting, cannot exclude self[-]inflicted vs[.]

---

[6]  In support of this allegation, Gayle purports to cite to an "Incident Report," see (id.), however, no such report is attached to his amended complaint or included among his separately filed exhibits. It is also unclear how Narcoonis, a member of USP Canaan's medical staff, could have placed Gayle in disciplinary segregation because such decisions are typically made by corrections staff.

> external trauma.  [R]eferred to the LT for questioning.  [N]o real seizure activity
> witnessed.  [Gayle] did attempt to feign a seizure while dental performed their
> exam.  [CT] scan of the brain and multiple EEG unremarkable.  [Gayle] medically
> cleared to return to his housing unit pending LT's decision.

See (Doc. No. 12 at 45).

The next event in Gayle's amended complaint occurred on January 24, 2023, when Veina

evaluated Gayle at Health Services.  (Id. at 46; Doc. No. 11 at 8.)  Veina's notes from this visit

indicate that Gayle had reported multiple seizures the prior day.  (Doc. No. 12 at 46.)  Those

notes also indicate that Veina's exam found that Gayle's vitals were within normal limits, and he

had "a small abrasion on the inside of his upper lip."  See (id. at 47).

On February 15, 2023, a chart review was performed by Dr. Diane Sommer at

"Telehealth" due to Gayle filing a BP-8 form.[7]  See (Doc. Nos. 11 at 8; 12 at 48).  Dr. Sommer's

notes reflect that she ordered a consultation with neurology so Gayle could be evaluated for

possible seizures.  (Doc. No. 12 at 48.)  She also noted that Gayle "insists he has seizures even

though staff never witness [them]," "has a negative head ct scan," has a "neg[ative] EEG,"

"refuses medication," "bites the[]inside of his mouth," and "never looses [sic] urine."  See (id.).

The final medical visit (and event) Gayle describes in his amended complaint is his visit

with Carey at Health Services on March 8, 2023.  (Id. at 49–50; Doc. No. 11 at 8, 9.)  Carey's

notes from this visit show that she checked his blood pressure due to it being elevated at his last

encounter.  (Doc. No. 12 at 49.)  Carey indicates that Gayle did not offer any new complaints,

and she rescheduled him for an additional check in a few months.  (Id.)  Although Carey's

---

[7]  The filing of a BP-8 form is the first step in the BOP's administrative grievance process.  See
28 C.F.R. § 542.13 ("[A]n inmate shall first present an issue of concern informally to staff, and
staff shall attempt to informally resolve the issue before an inmate submits a Request for
Administrative Remedy."); Stanton v. Paul, No. 22-cv-00647, 2024 WL 1916696, at *6 (M.D.
Pa. May 1, 2024) ("Before seeking formal review, an inmate must attempt to informally resolve
the issue with institutional staff by completing a BP-8 form." (citing 28 C.F.R. § 542.13)).

medical notes do not indicate this, Gayle alleges that Carey "gave [him] medication without daignosis [sic] of seizures . . . to validate medical treatment medication use." See (Doc. No. 11 at 9). Gayle also avers that "[t]his also clearly showed [him] that the staff/defendants were indifferent to [his] treatment based on [his] concerns and complaints of not wanting to take medication as [Dr. Dhaduk] advised [him]." See (id.).

After reviewing the amended complaint, this Court issued an Order on October 25, 2023, directing the United States Marshals to serve the amended complaint on the Government, and the Clerk's Office to send waiver of service forms to Defendants. (Doc. No. 13.) The individual Defendants waived service, and all Defendants filed the instant motions to dismiss the amended complaint or, in the alternative, for summary judgment on January 5, 2024. (Doc. No. 19.) After receiving an extension of time to file their supporting brief and statement of material facts in support of their motion for summary judgment, Defendants filed both documents on January 19, 2024. (Doc. Nos. 23, 24.) Although Gayle indicated that he was in the process of filing a response to Defendants' motions via a letter dated September 24, 2024 (Doc. No. 27), he has never filed a response to date. Thus, Defendants' motions are ripe for disposition.

## II.    LEGAL STANDARDS

### A.    Motions to Dismiss Under Rule 12(b)(1)

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial or a factual attack." Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016). "A court ruling on a facial attack considers only the complaint, viewing it in the light most favorable to the plaintiff." Long v. SEPTA, 903 F.3d 312, 320 (3d Cir. 2018) (citation omitted). However, a court ruling on a factual attack, wherein the defendant contests the truth of the jurisdictional allegations, "is a different matter: the court need not treat the allegations as true[.]" See id. (citations omitted).

"In reviewing a factual attack, the court may consider evidence outside the pleadings."  Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000) (citation omitted).  Indeed, "[b]ecause at issue in a factual 12(b)(1) motion is the trial court's . . . very power to hear the case[,] there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  In other words, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."  See id.

### B.    Motions to Dismiss Under Rule 12(b)(6)

Federal notice and pleading rules require the complaint to provide the defendant with notice of the claim and the grounds upon which it rests.  See Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief.  See Fed. R. Civ. P. 8(a).  Although this requires a complaint to consist of "only a short and plain statement of the claim showing that the pleader is entitled to relief," see Fed. R. Civ. P. 8(a)(2), a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."  See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff.  See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 312 (3d Cir. 2010).  The Court's inquiry is guided by the standards of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009).  Under Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of

pleading." See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). To prevent dismissal, a complaint must set out "sufficient factual matter" to show that the claims asserted therein are facially plausible. See id. The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct. As the Supreme Court instructed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" See Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the district court must: (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 679). When following these steps, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

In addition, in the specific context of pro se prisoner litigation, the Court must be mindful that a document filed pro se is "to be liberally construed." See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Higgs v. Att'y Gen., 655 F.3d 333, 339–40 (3d Cir. 2011) (explaining that "when presented with a pro se litigant, we have a special obligation to construe his complaint liberally" (citation and internal quotation marks omitted)). Therefore, a pro se complaint, "however

16

inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks omitted) (quoting Estelle, 429 U.S. at 106). This means the court must always "remain flexible, especially 'when dealing with imprisoned pro se litigants . . . .'" See Vogt v. Wetzel, 8 F.4th 182, 185 (3d Cir. 2021) (quoting Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 244–45 (3d Cir. 2013)). Additionally, when construing a pro se complaint, the court will "apply the relevant legal principle even when the complaint has failed to name it." See Mala, 704 F.3d at 244. However, pro se litigants "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants." See id. at 245.

### C.     Motions for Summary Judgment

The Court must render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. See id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). A dispute of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson, 477 U.S. at 257. When determining whether there is a genuine dispute of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party. See id. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor.").

17

To avoid summary judgment, the nonmoving party may not rest on the unsubstantiated allegations of their pleadings.  As such, when the party seeking summary judgment satisfies their burden to demonstrate the absence of a genuine dispute of material fact, the burden of production shifts to the nonmoving party, who must "go beyond the pleadings" with affidavits, "depositions, answers to interrogatories, and the like" to show specific material facts giving rise to a genuine dispute.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); id. at 328 (White, J., concurring).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation omitted).  Instead, they must produce evidence to show the existence of every element essential to their case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex Corp., 477 U.S. at 323; see also Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992) (explaining that since plaintiff had the burden of proof, "[they] must make a showing sufficient to establish the existence of every element essential to [their] case" (citations omitted)).

As noted supra, when determining whether a dispute of material fact exists, the Court must consider the evidence in the light most favorable to the non-moving party.  See Matsushita Elec. Indus. Co., 475 U.S. at 588 (citation omitted).  In doing so, the Court must "accept the non-movant's allegations as true and resolve any conflicts in [their] favor."  See White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988), abrogated on other grounds by Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993).  However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the

statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted."  See M.D. Pa. L.R. 56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that they are a pro se litigant because these rules apply with equal force to all parties.  See Mala, 704 F.3d at 245 (noting that pro se parties "cannot flout procedural rules— they must abide by the same rules that apply to all other litigants").

Even if the Court deems the facts in the moving party's submission to be admitted due to the nonmoving party's failure to comply with Local Rule 56.1, the Court cannot simply grant the motion for summary judgment as unopposed.  Instead, the Court can only grant the motion if the Court "find[s] that judgment for the moving party is 'appropriate.'"  See Anchorage Assocs. v. V.I. Bd. of Tax Rev., 922 F.2d 168, 175 (3d Cir. 1990).  The analysis for determining whether judgment is "appropriate" depends on whether the party moving for summary judgment bears the "burden of proof on the relevant issues":

> Where the moving party has the burden of proof on the relevant issues, this means that the district court must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law.  Where the moving party does not have the burden of proof on the relevant issues, this means that the district court must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law.

See id. (citing Celotex Corp., 477 U.S. 317).

## III.    DISCUSSION

In their combined motion, Defendants move for judgment in their favor because Gayle failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") prior to filing his complaint in this case.  (Doc. No. 24 at 24–27.)  Defendants also

move to dismiss Gayle's amended complaint on several grounds.  First, Defendants move to dismiss Gayle's <u>Bivens</u> claims for violations of his Eighth and Fourteenth Amendment rights because there are no <u>Bivens</u> remedies for these claims.  (<u>Id.</u> at 27–42.)  Second, if the Court determines that there are <u>Bivens</u> remedies for Gayle's claims, Defendants move for dismissal of these claims based on conduct occurring prior to May 24, 2021, because the statute of limitations bars those claims.  (<u>Id.</u> at 42–44.)  Third, Defendants argue that they are entitled to qualified immunity because Gayle failed to allege Simonson's personal involvement in any constitutional violation and his allegations against the other Defendants consists only of disagreements about the treatment he received.  (<u>Id.</u> at 44–53.)  Fourth, and finally, Defendants move for dismissal of Gayle's claim against the Government for lack of subject-matter jurisdiction or, alternatively, for Gayle's failure to state a claim upon which relief may be granted.  (<u>Id.</u> at 53–59.)

As discussed in more detail below, the Court will grant Defendants' motion to dismiss Gayle's <u>Bivens</u> claims for Eighth and Fourteenth Amendment violations because there are no <u>Bivens</u> remedies for those claims.  The Court will also grant Defendants' motion to dismiss Gayle's <u>Bivens</u> claim against the Government because it is immune from such a claim, and deny Gayle leave of Court to file a second amended complaint.

**A.    Gayle's <u>Bivens</u> Claim Against the Government**

Although Gayle included a FTCA against the Government in his original complaint, the Court understands him to have abandoned that claim in his amended complaint.  <u>See</u> (Doc. No. 1 at 1 (checking box on form civil rights complaint for <u>Bivens</u> claim but not checking box for FTCA claim)).  Instead, Gayle appears to be asserting a <u>Bivens</u> claim against the United States. As Defendants argue in their motion, the Government is immune from any <u>Bivens</u> claim Gayle

could attempt to assert against it.  Therefore, the Court will grant Defendants' motion to dismiss Gayle's Bivens claim against the Government.

Sovereign immunity constitutes a jurisdictional bar to claims against the United States and its agencies unless Congress has specifically waived such immunity.  See FDIC v. Meyer, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.  Sovereign immunity is jurisdictional in nature." (internal citations omitted)); Lewal v. Ali, 289 F. App'x 515, 516 (3d Cir. 2008) (unpublished) ("An action against government officials in their official capacities constitutes an action against the United States [and is] barred by sovereign immunity, absent an explicit waiver." (citations omitted)).  Similarly, sovereign immunity extends to individual officers acting in their official capacities, absent an explicit waiver.  See Treasurer of N.J. v. U.S. Dep't of Treasury, 684 F.3d 382, 395 (3d Cir. 2012).  Thus, "[w]ithout a waiver of sovereign immunity, a court is without subject matter jurisdiction over claims against federal agencies or officials in their official capacities."  See id. (citing United States v. Mitchell, 445 U.S. 535, 538 (1980)).  Congress has not waived the United States and its agencies' sovereign immunity from Bivens claims.  See Bishop v. U.S. Dep't of Homeland Sec., 648 F. App'x 180, 181 (3d Cir. 2016) (unpublished) ("[T]he District Court correctly determined that it lacked jurisdiction over [the plaintiff's] claims because the agencies' sovereign immunity for Bivens claims has not been explicitly waived by Congress.").  As such, sovereign immunity bars Gayle's Bivens claims against the Government, the Court will grant Defendants' motion to dismiss Gayle's Bivens claims against the Government under Rule 12(b)(1) for lack of subject-matter jurisdiction and dismiss these claims without prejudice.  See Lewal, 289 F. App'x at 516 ("Bivens claims against the United States are barred by sovereign immunity, absent an explicit waiver.").

Additionally, although the Court understands Gayle to have abandoned any FTCA claim against the Government in his amended complaint, even if he did not do so, the Government would still be immune from any FTCA claim based on the allegations in the amended complaint. The FTCA is a limited waiver of sovereign immunity and authorizes suits against the United States:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

See 28 U.S.C. § 1346(b)(1). Essentially, the FTCA renders the United States "liable to the same extent as a private party for certain torts committed by federal employees acting within the scope of their employment." See United States v. Orleans, 425 U.S. 807, 813 (1976).

The FTCA "does not itself create a substantive cause of action against the United States; rather, it provides a mechanism for bringing a state law tort action against the federal government in federal court." See In re Orthopedic Bone Screw Prod. Liab. Litig., 264 F.3d 344, 362 (3d Cir. 2001). "The FTCA only waives sovereign immunity for torts recognized under the law of the state in which the conduct was alleged to have occurred." Rinaldi v. United States, 904 F.3d 257, 272 n.15 (3d Cir. 2018); see also Meyer, 510 U.S. at 478 (explaining that the "law of the State" is "the source of substantive liability under the FTCA").

As relevant here, a plaintiff must comply with the FTCA's jurisdictional requirements, which are contained in 28 U.S.C. § 2675(a), before filing a FTCA claim in federal court. Section 2675(a) provides that "[a]n action shall not be instituted upon a claim against the United States ... unless the claimant shall have first presented the claim to the appropriate Federal agency and [their] claim shall have been finally denied by the agency." See 28 U.S.C. § 2675(a); see also

22

Shelton v. Bledsoe, 775 F.3d 554, 569 (3d Cir. 2015) ("No claim can be brought under the FTCA unless the plaintiff first presents the claim to the appropriate federal agency and the agency renders a final decision on the claim."). Thus, "[t]he FTCA contains a jurisdictional bar that requires a plaintiff to file [their] claim with the appropriate federal agency and receive a final denial by that agency before filing a complaint in federal court." See Banks v. Roberts, 251 F. App'x 774, 776 (3d Cir. 2007) (unpublished) (emphasis added) (citing 28 U.S.C. § 2675(a)); see also Kucera v. United States, No. 21-2133, 2022 WL 1112985, at *2 (10th Cir. Apr. 14, 2022) (unpublished) (affirming district court's dismissal of FTCA claim for lack of subject-matter jurisdiction because plaintiff did not demonstrate that "the agency had finally denied that claim before she filed this action"). A plaintiff's "[f]ail[ure] to follow this procedure deprives federal courts of subject matter jurisdiction." See Abulkhair v. Bush, 413 F. App'x 502, 506 (3d Cir. 2011) (unpublished) (citing White-Squire v. USPS, 592 F.3d 453, 456–58 (3d Cir. 2010)). Furthermore, this exhaustion requirement cannot be waived. See Roma v. United States, 344 F.3d 352, 362 (3d Cir. 2003) ("In light of the clear, mandatory language of the statute, and [the] strict construction of the limited waiver of sovereign immunity by the United States, . . . the requirement that the appropriate federal agency act on a claim before suit can be brought is jurisdictional and cannot be waived." (citing Livera v. First Nat'l Bank of N.J., 879 F.2d 1186, 1194 (3d Cir. 1989))).

The plaintiff "must plead administrative exhaustion in an FTCA case." See Guilford v. FCI Williamsburg, No. 22-cv-01945, 2022 WL 2192945, at *2 (E.D. Pa. June 16, 2022) (omission omitted) (quoting Colbert v. U.S. Postal Serv., 831 F. Supp. 2d 240, 243 (D.D.C. 2011)). In addition, the plaintiff "carries the burden of proof to establish presentment of [their] claim to [the agency]." See Medina v. City of Phila., 219 F. App'x 169, 172 (3d Cir. 2007)

(unpublished); see also Lincoln Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 105 (3d Cir. 2015) ("The burden of establishing federal jurisdiction rests with the party asserting its existence." (citing DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 n.3 (2006))).

Here, Gayle does not allege that he exhausted his administrative remedies with the BOP regarding any FTCA claim prior to filing his complaint in this case. See (Doc. No. 11 at 1–10). As such, even if Gayle intended to continue to prosecute a FTCA claim against the Government in this case, the Court would dismiss such a claim for lack of subject-matter jurisdiction because Gayle's allegations are insufficient to show that the Court has jurisdiction over any FTCA claim. See Burrell v. Loungo, 750 F. App'x 149, 155 (3d Cir. 2018) (unpublished) (affirming district court's dismissal of plaintiff's FTCA claims without prejudice for lack of subject-matter jurisdiction "[b]ecause the allegations of the complaint were not sufficient to indicate that the [d]istrict [c]ourt had jurisdiction over [plaintiff's] FTCA claims").

### B.    Eighth Amendment Bivens Claim

Defendants move under Rule 12(b)(6) to dismiss Gayle's Eighth Amendment deliberate-indifference-to-serious-medical-needs Bivens claim against them because his allegations present a new Bivens context and special factors counsel hesitation against granting a Bivens remedy here. (Doc. No. 25 at 22–30.) For the reasons stated below, the Court agrees with Defendants and concludes that no Bivens remedy is available for Gayle's Eighth Amendment claim.

Bivens "provides for private rights of action against federal officials for certain constitutional violations." See Bryan v. United States, 913 F.3d 356, 358 n.1 (3d Cir. 2019); Murphy v. Bloom, 443 F. App'x 668, 669 n.1 (3d Cir. 2011) (unpublished) ("Bivens recognized a private cause of action to recover damages against federal actors for constitutional violations, similar to the cause of action against state actors provided by 42 U.S.C. § 1983."). The Third

24

Circuit Court of Appeals recently discussed <u>Bivens</u> and the relevant analysis for this Court to consider and apply when evaluating the viability of a remedy for a plaintiff's <u>Bivens</u> claim as follows:

> In certain circumstances, the Constitution affords a cause of action for damages against individual federal officers to redress violations of constitutional rights. <u>Bivens</u>, 403 U.S. at 397, 91 S.Ct. 1999. "In the case giving the doctrine its name, the Supreme Court held there is a cause of action for damages when a federal agent, acting under color of his authority, conducts an unreasonable search and seizure in violation of the Fourth Amendment." [<u>Shorter v. United States</u>, 12 F.4th 366, 371 (3d Cir. 2021)] (citing <u>Bivens</u>, 403 U.S. at 389, 397, 91 S.Ct. 1999). In the decade following <u>Bivens</u>, the Supreme Court recognized two additional causes of action under the Constitution: first, for a congressional staffer's gender discrimination claim under the Fifth Amendment, <u>see</u> <u>Davis v. Passman</u>, 442 U.S. 228, 244, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and second, for a federal prisoner's inadequate-care claim under the Eighth Amendment, <u>see</u> [<u>Carlson v. Green</u>, 446 U.S. 14, 19, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); <u>Egbert v. Boule</u>, 596 U.S. 482, 490–91, 142 S.Ct. 1793, 213 L.Ed.2d 54 (2022)].
>
> Since then, the Supreme Court has "consistently refused to extend <u>Bivens</u> liability to any new context or new category of defendants," <u>Corr. Servs. Corp. v. Malesko</u>, 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001), and "has not implied additional causes of action under the Constitution," <u>Egbert</u>, 596 U.S. at 491, 142 S.Ct. 1793. Instead, in recognition that separation of powers principles are central to the analysis, the Court has "made clear that expanding the <u>Bivens</u> remedy is now a 'disfavored' judicial activity." [<u>Ziglar v. Abbasi</u>, 582 U.S. 120, 135, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017)] (quoting <u>Iqbal</u>, 556 U.S. at 675, 129 S.Ct. 1937). At bottom, the "question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" <u>Id.</u> (quoting <u>Bush v. Lucas</u>, 462 U.S. 367, 380, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983)). "The answer most often will be Congress," <u>id.</u>, as the "Judiciary's authority to do so at all is, at best, uncertain," <u>Egbert</u>, 596 U.S. at 491, 142 S.Ct. 1793. The Constitution entrusts the legislature— not the courts—with the power to fashion new causes of action. And "it is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation." <u>Abbasi</u>, 582 U.S. at 133, 137 S.Ct. 1843. Therefore, when considering whether to recognize a new implied cause of action for damages under a constitutional provision, "our watchword is caution." [<u>Hernandez v. Mesa</u>, 589 U.S. 93, 101, 140 S.Ct. 735, 206 L.Ed.2d 29 (2020)].
>
> Reflecting these concerns, the Supreme Court has set forth a two-step inquiry to determine the availability of <u>Bivens</u> remedies in a particular case. <u>See</u> <u>Abbasi</u>, 582 U.S. at 139–40, 137 S.Ct. 1843. First, we ask whether the "case presents a new

<u>Bivens</u> context"—<u>i.e.</u>, whether the "case is different in a meaningful way from previous <u>Bivens</u> cases decided by" the Supreme Court.  <u>Id.</u> at 139, 137 S.Ct. 1843. Only three cases serve as a benchmark: <u>Bivens</u>, <u>Davis</u>, and <u>Carlson</u>.  "And our understanding of a 'new context' is broad."  <u>Hernandez</u>, 589 U.S. at 102, 140 S.Ct. 735.

While the Court has not outlined "an exhaustive list of differences that are meaningful enough to make a given context a new one," factors to be considered include:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous <u>Bivens</u> cases did not consider.

<u>Abbasi</u>, 582 U.S. at 139–40, 137 S.Ct. 1843.  "If a case does not present a new <u>Bivens</u> context, the inquiry ends there, and a <u>Bivens</u> remedy is available."  <u>Shorter</u>, 12 F.4th at 372.

Alternatively, if the case presents a new context, we proceed to the second step of the inquiry and ask whether there are "special factors counselling hesitation" in extending <u>Bivens</u>.  <u>See</u> <u>Abbasi</u>, 582 U.S. at 136, 137 S.Ct. 1843.  The focus at this second step is "on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."  <u>Id.</u>  At this stage, two factors are "particularly weighty: the existence of an alternative remedial structure and separation-of-powers principles." <u>Bistrian v. Levi</u>, 912 F.3d 79, 90 (3d Cir. 2018) (citing <u>Abbasi</u>, 582 U.S. at 136, 137 S.Ct. 1843).  But <u>any</u> reason to pause is sufficient to forestall a <u>Bivens</u> extension. <u>Hernandez</u>, 589 U.S. at 102, 140 S.Ct. 735.

<u>Kalu v. Spaulding</u>, 113 F.4th 311, 325–26 (3d Cir. 2024).

With this recent guidance by the Third Circuit, the Court turns to the issue of whether

Gayle's <u>Bivens</u> claim presents a new context, and, if so, whether any special factors counsel

against extending a <u>Bivens</u> remedy to this case.

1.      **New Context**

Gayle asserts a <u>Bivens</u> claim against Defendants for violations of his Eighth Amendment rights in connection with the allegedly inadequate medical care he received for seizures he occasionally experienced while at USP Canaan.  (Doc. No. 11 at 4–9.)  In deciding whether Gayle's <u>Bivens</u> claim presents a new context, the Court must consider whether this case is "different in a meaningful way from previous <u>Bivens</u> cases decided" by the Supreme Court.  <u>See</u> <u>Abbasi</u>, 582 U.S. at 139.

Initially, the Court points out that Gayle's <u>Bivens</u> claim is dissimilar to <u>Bivens</u> itself, which was a Fourth Amendment "claim against FBI agents for handcuffing a man in his own home without a warrant," and <u>Davis</u>, which was a Fifth Amendment "claim against a Congressman for firing his female secretary . . . ."  <u>See</u> <u>id.</u> at 140 (citations omitted).  However, Gayle's <u>Bivens</u> claim bears some resemblance to <u>Carlson</u>.

In <u>Carlson</u>, the factual allegations of the plaintiff's Eighth Amendment <u>Bivens</u> claim were as follows:

> At the time of his death on August 15, 1975, Joseph Jones, Jr. was a prisoner in the federal penitentiary at Terre Haute, Indiana, serving a ten-year sentence for bank robbery.  He had been diagnosed as a chronic asthmatic in 1972 when he entered the federal prison system.  In July 1975, the prisoner's asthmatic condition required hospitalization for eight days at St. Anthony's Hospital in Terre Haute.  Despite the recommendation of the treating physician at St. Anthony's that he be transferred to a penitentiary in a more favorable climate, Jones was returned to the Terre Haute prison.  There he was not given proper medication and did not receive the steroid treatments ordered by the physician at St. Anthony's.

> On August 15 Jones was admitted to the prison hospital with an asthmatic attack.  Although he was in serious condition for some eight hours, no doctor saw him because none was on duty and none was called in.  It was further alleged that defendant Dr. Benjamin De Garcia, the chief medical officer directly responsible for the prison medical services, did not provide any emergency procedure for those times when a physician was not present.  As time went on Jones became more agitated and his breathing became more difficult.  Although Jones' condition was serious, defendant Medical Training Assistant William Walters, a nonlicensed

nurse then in charge of the hospital, deserted Jones for a time to dispense medication elsewhere in the hospital. On his return to Jones, Walters brought a respirator and attempted to use it despite the fact that Walters had been notified two weeks earlier that the respirator was broken. After Jones pulled away from the respirator and told Walters that the machine was making his breathing worse, Walters administered two injections of Thorazine, a drug contraindicated for one suffering an asthmatic attack. A half-hour after the second injection Jones suffered a respiratory arrest. Walters and Staff Officer Emmett Barry brought emergency equipment to administer an electric jolt to Jones, but neither man knew how to operate the machine. Jones was then removed to St. Francis Hospital in Terre Haute; upon arrival he was pronounced dead.

Green v. Carlson, 581 F.2d 669, 670 (7th Cir. 1978), aff'd sub nom., Carlson, 446 U.S. at 24.

Like the plaintiff in Carlson,[8] Gayle is a federal prisoner seeking a remedy for the alleged violation of his Eighth Amendment right to adequate medical care. Although the Court does not discount any discomfort, pain, or emotional distress Gayle may have suffered during his time at USP Canaan, there are material differences between the facts of this case and those in Carlson. First, and most significantly, "the injuries at issue are distinguishable from Carlson in both nature and severity." See Holton v. Finley, No. 21-cv-00737, 2024 WL 1919238, at *9 (M.D. Pa. Mar. 21, 2024) ("Holton II"), report and recommendation adopted, 2024 WL 1913172 (M.D. Pa. May 1, 2024); see also Bettis v. Grijalva, No. 21-cv-07505, 2023 WL 4141869, at *6 (S.D.N.Y. June 23, 2023) ("Courts have routinely found [that] variances in circumstances and severity render deliberate indifference claims different from Carlson and thus arise in a 'new context.'" (citing cases)). Carlson involved an inmate with a pre-existing and chronic respiratory illness, and "it was apparent to medical staff that the inmate was suffering from severe and life-threatening symptoms during an asthma attack." See Holton II at *9. These severe and life-threatening symptoms ultimately resulted in the inmate's death. See Carlson, 446 U.S. at 16 n.1. In this

---

[8] As discussed infra, the plaintiff was decedent's mother, who was administratrix of his estate. See id.

case, Gayle alleges that Defendants did not appropriately treat him for occasional seizures he experienced, with the extent of his injuries being minor injuries to his tongue or lip. Gayle's alleged medical issues were thankfully not fatal, and he does not allege that they were remotely close to life-threatening. See (Doc. Nos. 11 at 4–10; 12 at 1–50); see also Washington v. Fed. Bureau of Prisons, No. 16–cv–03913, 2022 WL 3701577, at *5 (D.S.C. Aug. 26, 2022) ("Plaintiff's Bivens claims do not involve a medical emergency, as did Carlson, but rather focus on a long term and ongoing course of medical treatment of [p]laintiff's chronic, non-fatal condition.").

Second, Gayle's allegations in his amended complaint show that he received medical attention well beyond what the decedent received in Carlson. In Carlson, the inmate never received competent medical care. Gayle, on the other hand, told Carey on August 28, 2019, that he had a history of blackouts following a motor vehicle accident in 2015 and yet apparently never had a prior workup performed. (Doc. No. 12 at 1, 2.) When Gayle complained about having seizures, he was prescribed antiseizure medication that he generally refused to take. (Id. at 4, 6.) In addition, the following day, Gayle had a CT scan without contrast performed that was unremarkable. (Id. at 5.) He later had EEGs performed which did not show any seizure activity. See, e.g., (id. at 12). Overall, while Gayle complains of allegedly not receiving a diagnosis for his seizures, he received care throughout the periods described in the complaint, which describe only occasional seizure episodes. Furthermore, although Gayle alleges that the care he received was ineffective, he received far more care than the inmate in Carlson.

Third, and finally, the action in Carlson was initiated by the deceased inmate's estate, whereas Gayle commenced the instant action pro se. See 446 U.S. at 16 n.1. As such, the BOP's administrative remedy program available to Gayle at USP Canaan was unavailable to the

inmate's estate in Carlson.  See Holton II at *9 (finding distinction between Carlson and the case

at issue because "the administrative remedy program available to Plaintiff in the prison was not

available to the inmate's estate in Carlson"); Washington, 2022 WL 3701577, at *5 (explaining

that the difference between the status of the plaintiff in Carlson and the plaintiff in the case

before the court was "significant for multiple reasons, including that administrative and

injunctive relief would have a completely different application to [p]laintiff's claims than to the

claims in Carlson").

Therefore, while the "right at issue" (i.e., the Eighth Amendment) and the alleged

"mechanism of injury" (i.e., the failure to provide adequate medical care) are the same in this

case as in Carlson, the Court concludes that Gayle's case would extend Carlson to a new context.

See Abbasi, 582 U.S. at 139 (explaining that even claims which challenge the failure to provide

medical treatment can involve the same "right at issue" and "mechanism of injury" as Carlson,

but still have "different" contexts (citing Malesko, 534 U.S. at 64, 70, and n.4)); see also id. at

147 (instructing that "even a modest extension is still an extension" of Bivens).  Because Gayle's

claim presents a new Bivens context, the Court now proceeds to the second step of the analysis

for recognition of a Bivens remedy.

### 2.    Special Factors

In addition to the factual differences between Carlson and the instant case, the Supreme

Court has "explained that a new context arises when there are 'potential special factors that

previous Bivens cases did not consider.'"  See Egbert, 596 U.S. at 492 (quoting Abbasi, 582 U.S.

at 140).  As discussed below, the Court concludes that there are special factors here which

counsel against extending a Bivens remedy to Gayle's Eighth Amendment claims.  These special

factors were not considered by the Carlson court, which further supports the Court concluding

that Gayle's case presents a new context.  See Abbasi, 582 U.S. at 148 (instructing that "a case

can present a new context for Bivens purposes . . . if there are potential special factors that were

not considered in previous Bivens cases" (citation omitted)); see also Egbert, 596 U.S. at 492

(acknowledging overlap between the two (2)-part inquiry insofar that the two (2) parts "often

resolve to a single question[,]" i.e., "whether there is any reason to think that Congress might be

better equipped to create a damages remedy").

       As explained by the Supreme Court, a special factor suggests that Congress is better

equipped than the judiciary to "weigh the costs and benefits" of creating a new damages remedy.

See Egbert, 596 U.S. at 492 (citation and internal quotation marks omitted).  If "there is any

rational reason (even one) to think that Congress is better suited to 'weigh the costs and benefits

of allowing a damages action to proceed[,]'" then the Court cannot imply a cause of action for

damages under Bivens.  See id. at 496 (citation and internal quotation marks omitted).

       Here, there are special factors weighing against extending a Bivens remedy to Gayle's

claims for alleged violations of his Eighth Amendment rights.  First, as briefly mentioned above,

an alternative remedial mechanism existed for Gayle, which "independently foreclose[s] a

Bivens action here."  See Egbert, 596 U.S. at 497.  More specifically, the BOP's Administrative

Remedy Program, which allows federal inmates to seek review of an issue related to "any

aspect" of their confinement, provided an alternative process for addressing Gayle's claims.  See

28 C.F.R. § 542.10(a) (providing that "[t]he purpose of the Administrative Remedy Program is to

allow an inmate to seek formal review of an issue relating to any aspect of his/her own

confinement"); see also Malesko, 534 U.S. at 68 (holding that "administrative review

mechanisms" can provide "meaningful redress and thereby foreclose[] the need to fashion a new,

judicially crafted cause of action[,]" even if those mechanisms do not "fully remedy the

constitutional violation"); Egbert, 596 U.S. at 497 (explaining that "court[s] may not fashion a Bivens remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure" and that, "[i]f there are alternative remedial structures in place, that alone, like any special factor, is reason enough to limit the power of the Judiciary to infer a new Bivens cause of action" (citation and internal citations and quotation marks omitted)). Accordingly, "when alternative methods of relief are available," as they were here, "a Bivens remedy usually is not."  See Abbasi, 582 U.S. at 145.

Second, "the Judiciary is not undoubtedly better positioned than Congress to authorize a damages action" in the context of medical care in federal prisons.  See Egbert, 596 U.S. at 492. The Supreme Court has generally acknowledged that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform[,]" that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government[,]" and that this "task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint."  See Turner v. Safley, 482 U.S. 78, 84–85 (1987) (emphasis added) (internal citation and internal quotation marks omitted).  Thus, extending a Bivens remedy to this new context "would step well into the lawmaking privilege delegated only to Congress, and well over the bounds of [the Court's] limited constitutional power."  See Mammana v. Barben, 856 F. App'x 411, 415 (3d Cir. 2021) (unpublished) (setting forth this principle in the context of a Bivens claim based upon allegedly unconstitutional conditions of confinement in violation of the Eighth Amendment).

Based on the above, the Court concludes that special factors counsel hesitation in extending a Bivens remedy to Gayle's Eighth Amendment claims against the individual

Defendants for deliberate indifference to his serious medical needs.  See Egbert, 596 U.S. at 496 (stating that, if "there is any rational reason (even one) to think that Congress is better suited to 'weigh the costs and benefits of allowing a damages action to proceed[,]'" then the court cannot imply a cause of action for damages under Bivens (emphasis in original) (citation and internal quotation marks omitted)).  Additionally, while the instant case and Carlson both involve Eighth Amendment claims of inadequate medical care in the federal prison context, "these superficial similarities are not enough to support the judicial creation of a cause of action."  See id. at 495 (explaining that "almost parallel circumstances" or "superficial similarities" with Bivens, Davis, and Carlson "are not enough to support the judicial creation of a cause of action" (citation and internal quotation marks omitted)).

### C.    Fourteenth Amendment Bivens Claim

Defendants move for dismissal of Gayle's Fourteenth Amendment Bivens claim against the individual Defendants under Rule 12(b)(6) because they are federal officials, and the Fourteenth Amendment does not apply to them.  (Doc. No. 24 at 41–42.)  The Court agrees.

The Fourteenth Amendment provides, in relevant part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend XIV, § 1 (emphasis added). As illustrated by its reference to the "State," "the Fourteenth Amendment only applies to the actions of states and not to the federal government . . . ."  See Brown v. Philip Morris Inc., 250 F.3d 789, 800 (3d Cir. 2001).  Therefore, the Court will grant Defendants' motion to dismiss Gayle's Fourteenth Amendment Bivens claim for the failure to state a claim under Rule 12(b)(6).

To the extent that Gayle meant to assert due process claims under the Fifth Amendment, which is applicable to federal officials, see Santos v. Sec'y of D.H.S., 532 F. App'x 29, 33 (3d

Cir. 2013) (unpublished) ("[T]he Fifth Amendment applies to actions of the federal government,

not state actions[.]" (citing Citizens for Health v. Leavitt, 428 F.3d 167, 178 n.11 (3d Cir.

2005))), his claims would still fail.  In this regard, a prisoner-plaintiff cannot

> sustain a Fifth Amendment due process claim under Bivens in light of Ziglar and
> its progeny.  It is now generally conceded that such inmate due process claims also
> present new factual contexts under Ziglar.  Railey v. Ebbert, 407 F. Supp. 3d 510,
> 522 (M.D. Pa. 2019) (collecting cases).  Moreover, we have found that the
> challenge of prison administration constitutes "a special factor precluding the
> extension of Bivens to [an inmate's] Fifth Amendment due process claim."  Louis-
> El v. Ebbert, 448 F. Supp. 3d 428, 440 (M.D. Pa. 2020).

See Cordova v. Garland, No. 22-cv-00816, 2025 WL 19822, at *11 (M.D. Pa. Jan. 2, 2025).

Accordingly, Gayle's possible Fifth Amendment due process claims against the individual

Defendants will also be dismissed for failure to state a claim due to the lack of a Bivens remedy.

### D.    Leave to Amend

Having determined that Gayle's claims against Defendants are subject to dismissal, the

Court must determine whether to grant him leave to replead those claims in a second amended

complaint.  Courts should generally give leave to amend but may dismiss a complaint with

prejudice where leave to amend would be inequitable or futile.  See Fletcher-Harlee Corp. v.

Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007) ("[I]n civil rights cases district

courts must offer amendment—irrespective of whether it is requested—when dismissing a case

for failure to state a claim unless doing so would be inequitable or futile."); see also Grayson,

293 F.3d at 108 ("When a plaintiff does not seek leave to amend a deficient complaint after a

defendant moves to dismiss it, the court must inform the plaintiff that [they have] leave to amend

within a set period of time, unless amendment would be inequitable or futile.").  "In determining

whether [amendment] would be futile, the district court applies the same standard of legal

sufficiency as [it] applies under Fed. R. Civ. P. 12(b)(6)." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).

Based on the Court's analysis of Gayle's claims, he will not be given leave to file a second amended complaint because any further amendment would be futile. In this regard, there are no Bivens remedies available for his claims under the Eighth and Fourteenth Amendments, or for any possible due process claims under the Fifth Amendment. Additionally, the Court lacks subject-matter jurisdiction over Gayle's Bivens claim against the Government, and he has abandoned any FTCA claim in his amended complaint. Moreover, even if Gayle had not abandoned his FTCA claim in his amended complaint, he has not included any allegations in his original complaint or his amended complaint that would demonstrate that he exhausted his administrative remedies prior to asserting an FTCA claim in this case.

## IV.    CONCLUSION

For the reasons stated above, the Court will grant Defendants' motion to the extent they seek dismissal of Gayle's claims against the Government under Rule 12(b)(1) for lack of subject-matter jurisdiction, his Bivens claims against the individual Defendants for deliberate indifference to his serious medical needs in violation of the Eighth Amendment under Rule 12(b)(6), and his Bivens claims against the individual Defendants for due process violations under either the Fourteenth or Fifth Amendments under Rule 12(b)(6). The Court will deny Defendants' alternative motion for summary judgment as moot. The Court will not grant Gayle leave to file a second amended complaint and will direct the Clerk of Court to close this case. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania
